IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Kori Patrick Marshall, | ) | Civil Action No. 8:16-2142-RMG-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Nancy A. Berryhill, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1] Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for social security insurance benefits ("SSI"). For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

An application for SSI was filed on behalf of Plaintiff alleging his disability began on August 14, 2012, when he was a child under the age of 18. [R. 185–94.] The claim was denied initially [R. 111–14] and upon reconsideration [R. 97–109]. Thereafter, Plaintiff filed a written request for hearing and, on September 15, 2014, appeared with an attorney and

---

[1] A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

his mother and testified at a hearing before Administrative Law Judge ("ALJ") Jerry W. Peace. [R. 36–80.] At the time of the hearing, Plaintiff was over age 18 because he attained age 18 on August 29, 2012. [R. 15.]

The ALJ issued a decision on December 3, 2014, finding Plaintiff not disabled under the Social Security Act ("the Act"). [R. 11–31.] The ALJ undertook two separate analyses: first whether Plaintiff was disabled for the period before age 18; and second whether Plaintiff was disabled beginning at age 18. [R. 11.] At Step 1,[2] the ALJ found Plaintiff was born on August 30, 1994, and was therefore in the "Adolescents (age 12 to attainment of age 18)" age group on August 14, 2012, the date the application was filed, and had not engaged in substantial gainful activity since the date the application was filed. [R. 15, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had severe impairments of epilepsy and borderline intellectual functioning. [R. 16, Finding 3.] The ALJ also noted that Plaintiff had a non-severe impairment of borderline diabetes. [R. 16.] At Step 3, the ALJ found that, before attaining age 18, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [R. 16, Finding 4.]

The ALJ also found that, before age 18, Plaintiff did not have an impairment or combination of impairments that functionally equaled the listings. [R. 16, Finding 5.] In assessing the six domains of functioning, the ALJ found that, before the age of 18, Plaintiff had marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks; less than marked limitations in interacting and relating with

_____

[2] The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

others; no limitations in moving and manipulating objects; less than marked limitations in his ability to care for himself; and less than marked limitations in his health and physical well-being. [R. 18–23.] Because Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing or functionally equaled the listings, the ALJ found that Plaintiff was not disabled prior to attaining age 18. [R. 23, Finding 6.]

In determining Plaintiff's disability status after age 18, the ALJ first found that Plaintiff had not developed any new impairment or impairments since attaining age 18. [R. 24, Finding 7.] The ALJ noted that Plaintiff's alleged headaches were a non-severe impairment because they were well-controlled until March 2014, when he sustained head trauma. [R. 24.] Proceeding to Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. [R. 24, Finding 9.] The ALJ specifically considered Listings 12.05B and 12.05D with respect to Plaintiff's intellectual disability. [R. 24–25.] The ALJ also mentioned 12.02 and 12.05C. [R. 24.]

Before addressing Step 4, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found as follows:

> After careful consideration of the entire record, I find that, since attaining age 18, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes, scaffolds, ramps, or stairs; avoid even moderate use of moving machinery and moderate exposure to unprotected heights; work is limited to simple, routine, and repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, and with few, if any, work place changes.

[R. 26, Finding 10.] Based on this RFC, Plaintiff's age (attaining the age of 18), education,

lack of past relevant work experience, and the testimony of a vocational expert ("VE"), the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 29, Finding 15.] Accordingly, the ALJ concluded Plaintiff had not been under a disability, as defined in the Act, since August 29, 2012, the day the Plaintiff attained age 18, through the date of the decision. [R. 30, Finding 16.]

Plaintiff requested Appeals Council review of the ALJ's decision, but on April 21, 2016, the Appeals Council declined. [R. 1–6.] Plaintiff filed the instant action for judicial review on June 23, 2016. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends that errors by the ALJ require the decision to be remanded for further administrative proceedings. [*See* Doc. 16.] Specifically, Plaintiff alleges the ALJ's findings with respect to the severity of Plaintiff's functional limitations under childhood disability standards is not supported by substantial evidence. [*Id*. at 6–15.] Plaintiff also contends the ALJ failed to provide an appropriate hypothetical to the VE, in accordance with SSR 11-2p, regarding Plaintiff's work related limitations under adult disability standards. [*Id*. at 15–16.] Lastly, Plaintiff challenges the ALJ's weighing of the opinion testimony of his mother. [*Id*. at 16–17.]

The Commissioner contends the decision is supported by substantial evidence and should be affirmed. [Doc. 17.] Specifically, the Commissioner argues that substantial evidence supports the ALJ's findings with respect to the severity of Plaintiff's functional limitations. [*Id*. at 12–20.] The Commissioner also contends the ALJ properly applied SSR 11-2p in evaluating Plaintiff's disability and extensively discussed numerous considerations relevant to young adults highlighted in Ruling 11-2p, such as Plaintiff's school records,

including his individual educational plan ("IEP") and teacher questionnaires; psychological evaluation results; the vocational rehabilitation records; testimony and statements from Plaintiff's mother; Plaintiff's own testimony; and testimony and documentation concerning Plaintiff's activities of daily living.  [*Id*. at 20–21.]  Lastly, the Commissioner concludes that the ALJ properly weighed the statements of Plaintiff's mother regarding his limitations and properly concluded that Plaintiff's mother's opinions were less persuasive.  [*Id*. at 21–22.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th

Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court

must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material

and that there is good cause for the failure to incorporate such
evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the

basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

determination of disability at the time the application was first filed; (2) the evidence is

material to the extent that the Commissioner's decision might reasonably have been

different had the new evidence been before him; (3) there is good cause for the claimant's

failure to submit the evidence when the claim was before the Commissioner; and (4) the

claimant made at least a general showing of the nature of the new evidence to the

reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C.

§ 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d

26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by*

*amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[3] With remand under sentence

six, the parties must return to the court after remand to file modified findings of fact.

*Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and

does not enter a final judgment until after the completion of remand proceedings. *See*

---

[3] Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth
in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the
Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating
a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152,
2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107,
2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No.
2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health &*
*Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme
Court of the United States has not suggested *Borders'* construction of § 405(g) is incorrect.
*See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply
the more stringent *Borders* inquiry.

*Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

**1.    The Three Step Evaluation for Individuals under Age 18**

A child[4] is considered disabled for purposes of SSI if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  To facilitate a uniform and efficient processing of disability claims, the Administration has promulgated regulations under the Act that reduce the statutory definition of disability to a series of sequential questions.  *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983) (discussing considerations in adult disability matter and noting "need for efficiency" in considering disability claims).  The regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

(1)    Is the child engaged in any substantial gainful activity?[5]  If so, benefits are denied.

(2)    Does the child have a medically severe impairment or combination of

---

[4] A "child" is an individual under the age of 18.  *See* 42 U.S.C. § 1382c(a)(3)(C)(i).

[5] In determining whether a child has engaged in substantial gainful activity ("SGA"), the Commissioner uses the same rules as used for adults.  *See* 20 C.F.R. § 416.924(b).  SGA is work activity that is both substantial and gainful and involves doing significant physical or mental activities for pay or profit, regardless of whether a profit is realized.  *Id.* § 416.972.

impairments?[6]  If not, benefits are denied.

(3)     Does the child's impairment(s) meet, medically equal, or functionally equal an impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?[7]  If so, benefits are granted.

20 C.F.R. § 416.924(a)–(d).

To assess functional equivalence, the Commissioner assesses the interactive and cumulative effects of all of the child's impairments for which there is record evidence, including any non-severe impairments.  20 C.F.R. § 416.926a(a).  First, the Commissioner considers everything the child does at home, at school, and in the community and determines what the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of his impairment(s).  *Id.*  When the Commissioner assesses the child's functional limitations, he considers all the relevant factors contained in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929, including (1) how well the child can initiate and

---

[6] For a child, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  20 C.F.R. § 416.924(c).

[7] In determining whether a child's impairment meets one of the listed impairments, the Commissioner compares the symptoms, signs, and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, . . . then [the child] 'is conclusively presumed to be disabled and entitled to benefits.'"  *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).  "For a [child] to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  It is not enough that the impairment have the diagnosis of a listed impairment; the child "must have a medically determinable impairment(s) that satisfies all of the criteria of the listing."  20 C.F.R. § 416.925(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987) (noting it is the claimant's burden to show a medically determinable impairments and to furnish medical evidence regarding the condition).

sustain activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment.  *Id.*

Next, the Commissioner considers how the child functions in activities in terms of six domains, which are broad areas of functioning intended to capture what a child can or cannot do.  *Id.* § 416.926a(b)(1).  These domains are

(1) acquiring and using information;

(2) attending and completing tasks;

(3) interacting and relating with others;

(4) moving about and manipulating objects;

(5) caring for oneself; and

(6) health and physical well being.

*Id.*  Limitations are assessed by comparing the child's functioning to the functioning of children of the same age who do not have impairments.  *Id.* §§ 416.924a(b)(3), 416.926a(b)(1).  To establish functional equivalence, the child must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two domains or an "extreme" limitation in one domain.  *Id.* § 416.926a(a), (d). A child has a "marked" limitation in a domain when his impairment or combination of impairments seriously interferes with his ability to independently initiate, sustain, or complete activities.  *Id.* § 416.926a(e)(2)(i).  A "marked" limitation is a limitation that is "more than moderate" but "less than extreme" and may limit only one or several activities or functions.  *Id.*  A child has an "extreme" limitation in a domain when his impairment or combination of impairments very seriously interferes with his ability to independently

initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). An "extreme" limitation is a limitation that is "more than marked," and "extreme" is the rating given to the worst limitations, although it does not necessarily mean the child experiences a total lack or loss of ability to function. *Id.*

**The Six Domains**

(1)   *Acquiring and Using Information*

Under the domain of Acquiring and Using Information, the Commissioner must consider the claimant's ability to learn information and to think about and use the information. *Id.* § 416.926a(g). School records provide important information for assessing limitations in this domain. SSR 09-3p, 74 Fed. Reg. 7,511-01, at 7,513 (Feb. 17, 2009). "Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment(s)." *Id.* Further, school records may reveal that mental or physical impairments interfere with the claimant's ability to acquire and use information by showing the claimant receives:

> • Special education services, such as assignment of a personal aide who helps the [claimant] with classroom activities in a regular classroom, remedial or compensatory teaching methods for academic subjects, or placement in a self-contained classroom.
>
> • Related services to help the child benefit from special education, such as occupational, physical, or speech/language therapy, or psychological and counseling services.
>
> • Other accommodations made for the child's impairment(s), both inside and outside the classroom, such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring.

*Id.*  The kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment(s).  *Id.*  The Commissioner will also "consider evidence about the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information)," and limitations are assessed in all settings, not just in school.  *Id.*

(2)    *Attending and Completing Tasks*

For this domain, the Commissioner considers how well the child is able to focus and maintain his attention and how well he can begin, carry through, and finish activities, as well as the pace at which he can perform activities and the ease with which he can change them.  20 C.F.R. § 416.926a(h).  As with the other domains, limitations[8] in this domain are determined based on various age group descriptors.  *Id.* § 416.926a(h)(2).  For instance, as a preschooler, the child should be able to pay attention when spoken to directly, sustain attention to play and learning activities, concentrate on activities like putting puzzles together or completing art projects, get his clothes together and dress himself, feed himself, and put away toys.  *Id.*  The child should usually be able to wait his turn and to change his activity when a caregiver or teacher says it is time to do something else.  *Id.* When a child is of school age, he should be able to focus his attention to follow directions, remember and organize his school materials, and complete classroom and homework

---

[8] Examples of limited functioning in Attending and Completing Tasks include: (i) being easily startled, distracted, or overreactive to sounds, sights, movements, or touch; (ii) slow to focus on, or fail to complete, activities of interest, e.g., games or art projects; (iii) repeatedly sidetracked from activities or frequently interrupt others; (iv) easily frustrated and give up on tasks, including ones the child is capable of completing; and (v) requires extra supervision to keep engaged in an activity.  20 C.F.R. § 416.926a(h)(3).

assignments.  *Id.*  He should be able to concentrate on details; not make careless mistakes

in his work beyond what would be expected in other children who do not have impairments;

change his activities or routines without distracting himself or others; and stay on task and

in place when appropriate.  *Id.*  Moreover, the school-age child should be able to sustain

his attention well enough to participate in group sports, read by himself, and complete

family chores, as well as be able to complete a transition task—such as to be ready for the

school bus, change clothes after gym, or change classrooms—without extra reminders and

accommodation.  *Id.*

(3)     *Interacting and Relating With Others*

With respect to this domain, the Commissioner considers how well the child can

initiate and sustain emotional connections with others, develop and use the language of

his community, cooperate with others, comply with rules, respond to criticism, and respect

and take care of the possessions of others.  *Id.* § 416.926a(i).  Generally, the child must

be able to speak intelligibly and fluently so that others can understand him; participate in

verbal turntaking and nonverbal exchanges; consider others' feelings and points of view;

follow social rules for interaction and conversation; and respond to others appropriately and

meaningfully.   *Id.*  A child with limitations[9] in this domain may have various kinds of

difficulties:

---

[9] Examples of limited functioning in Interacting and Relating With Others include: (i) inability to reach out to be picked up or held by caregiver; (ii) no close friends or friends are all older or younger than the child; (iii) avoids or withdraws from people the child knows or is overly anxious or fearful of meeting new people or trying new experiences; (iv) difficulty playing games or sports with rules; (v) difficulty communicating with others; e.g., in using verbal and nonverbal skills to express himself, carrying on a conversation, or in asking others for assistance; (vi) difficulty speaking intelligibly or with adequate fluency.  20 C.F.R. § 416.926a(i)(3).

For example, the child may not understand:

• How to approach other children,

• How to initiate and sustain social exchanges, and

• How to develop meaningful relationships with others.

Children with impairment-related limitations in this domain may not be disruptive; therefore, their limitations may go unnoticed. Such children may be described as socially withdrawn or isolated, without friends, or preferring to be left alone. These children may simply not understand how to accomplish social acceptance and integration with other individuals or groups. However, because children achieve much of their understanding about themselves and the world from their interactions, the impairment-related limitations of children who withdraw from social interaction may be as significant as those of children whose impairments cause them to be disruptive.

SSR 09-5p, 74 Fed. Reg. 7,515-01, at 7,516 (Feb. 17, 2009) (footnote omitted). Further, the domain of Interacting and Relating With Others is related to the domain of Caring for Yourself, but Interacting and Relating With Others involves the child's feelings and behavior in relation to others while Caring for Yourself involves the child's feelings and behavior in relation to himself. *Id.* at 7,517.

(4)  *Moving About and Manipulating Objects*

Under this domain, the Commissioner considers how a child moves his body from one place to another and how he moves and manipulates things, which is an assessment of the child's gross and fine motor skills. 20 C.F.R. § 416.926a(j). Generally, moving the body involves several different kinds of actions: rolling; rising or pulling from a sitting to a standing position; pushing up; raising the head, arms, and legs, and twisting the hands and feet; balancing weight on the legs and feet; shifting weight while sitting or standing; transferring from one surface to another; lowering to or toward the floor as when bending,

kneeling, stooping, or crouching; moving forward and backward in space as when crawling, walking, or running, and negotiating different terrains (e.g., curbs, steps, and hills). *Id.* § 416.926a(j)(1)(i). Moving and manipulating objects involves several different kinds of actions: engaging the upper and lower body to push, pull, lift, or carry objects from one place to another; controlling the shoulders, arms, and hands to hold or transfer objects; coordinating the eyes and hands to manipulate small objects or parts of objects. *Id.* § 416.926a(j)(1)(ii). Physical and mental impairments, as well as some medications, may affect the child's abilities in this domain:

> For example:
>
> • A child with a benign brain tumor may have difficulty with balance.
>
> • A child with rheumatoid arthritis may have difficulty writing.
>
> • A child with a developmental coordination disorder may be clumsy or have slow eye-hand coordination.
>
> . . . [S]ome antidepressant medications may cause hand tremors that interfere with fine motor skills. If these effects persist over time, [the Commissioner will] consider them in this domain.

SSR 09-6p, 74 Fed. Reg. 7,518-01, at 7,520 (Feb. 17, 2009). This domain focuses on motor limitations caused by the child's impairments or medications, while the domain of Health and Physical Well-Being involves the cumulative physical effects—such as pain, weakness, dizziness, nausea, reduced stamina, or recurrent infections—of physical and mental impairments and their associated treatments that are not addressed in the domain of Moving About and Manipulating Objects. *Id.*

(5)     *Caring for Yourself*

With respect to this domain, the Commissioner considers how well the child can maintain a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). "Caring for yourself" effectively means the child becomes increasingly independent in making and following his own decisions, which entails relying on his own abilities and skills and displaying consistent judgment about the consequences of caring for himself. *Id.* § 416.926a(k)(1)(ii). This domain does not address the child's physical abilities to perform self-care tasks, which are addressed under the domains of Moving About and Manipulating Objects and Health and Physical Well-Being, as appropriate, nor does this domain address the ability to relate to other people, which is addressed under the domain of Interacting and Relating With Others. SSR 09-7p, 74 Fed. Reg. 7,521-01, at 7,522 (Feb. 17, 2009). Rather, this domain addresses the child's ability to recognize when he is ill, follow recommended treatment, take medication as prescribed, follow safety rules, respond to his circumstances in safe and appropriate ways, make decisions that do not endanger himself, and know when to ask for help from others. 20 C.F.R. § 416.926a(k)(1)(iv). As with limitations in other domains, limitations in the domain of Caring for Yourself may result from physical or mental impairment(s), medication, or other treatment. SSR 09-7p, 74 Fed. Reg. at 7,522.

(6)     *Health and Physical Well-Being*

Under this domain, the Commissioner considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the child's

functioning that were not considered under the domain of Moving and Manipulating Objects. 20 C.F.R. § 416.926a(l). A physical or mental disorder may have physical effects that vary in kind and intensity, and may make it difficult for a child to perform his activities independently or effectively. *Id.* § 416.926a(l)(1). For instance, the child may experience problems such as generalized weakness, dizziness, shortness of breath, reduced stamina, fatigue, psychomotor retardation, allergic reactions, recurrent infection, poor growth, bladder or bowel incontinence, or local or generalized pain. *Id.* In addition, the medications taken (e.g., for asthma or depression) or the treatments received (e.g., chemotherapy or multiple surgeries) may have physical effects that also limit the child's performance of activities. *Id.* § 416.926a(l)(2). Thus, this domain does not address typical development and functioning but rather addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's body. SSR 09-8p, 74 Fed. Reg. 7,524-01, at 7,525 (Feb. 17, 2009). Accordingly, there are special considerations in this domain:

> For example:
>
> • A child who otherwise appears to be functioning appropriately may be doing so because of intensive medical or other care needed to maintain health and physical well-being. [The Commissioner] evaluates such medical fragility in this domain.
>
> • Some disorders (for example, cystic fibrosis and asthma) are episodic, with periods of worsening (exacerbation) and improvement (remission). When symptoms and signs fluctuate, [the Commissioner] considers the frequency and duration of exacerbations, as well as the extent to which they affect a child's ability to function physically.
>
> In all cases, it is important to remember that the cumulative physical effects of a child's physical or mental impairment(s) can vary in kind and intensity, and can affect each child

18

differently.

*Id.* at 7,526 (footnote omitted).  Further, as in all domains, the child's limitations in Health and Physical Well-Being must result from a medically determinable impairment(s).  20 C.F.R. § 416.926a(l)(4).

## 2.  The Five Step Evaluation for Determining Adult Disability

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. § 416.920.  Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699

F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.  *Grant*, 699 F.2d at 191.  If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. § 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.      *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* § 416.974–.975.

### B.      *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  *See id.* § 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir.

1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C. *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[10] 20 C.F.R. § 416.920(a)(4)(iii), (d).

### D. *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the

---

[10] The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

claimant's residual functional capacity[11] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. § 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[12]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to

---

[11] Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).

[12] An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 416.969a(c)(1).

perform other work.  20 C.F.R. § 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 416.927(c). Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 416.927(c)(2). An ALJ determination coming

down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV. Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V. Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling

pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth
> Circuit (North Carolina, South Carolina, Maryland, Virginia and
> West Virginia), Social Security Ruling (SSR) 88-13, Titles II
> and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying
> physical or [m]ental impairment that could reasonably be
> expected to cause pain is shown by medically acceptable
> objective evidence, such as clinical or laboratory diagnostic
> techniques, the adjudicator must evaluate the disabling effects
> of a disability claimant's pain, even though its intensity or
> severity is shown only by subjective evidence. If an underlying
> impairment capable of causing pain is shown, subjective
> evidence of the pain, its intensity or degree can, by itself,
> support a finding of disability. Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered. Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485;

*see also* 20 C.F.R. § 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.   Credibility

The ALJ must make a credibility determination based upon all the evidence in the

record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).  Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Plaintiff's Background**

### *Brief Summary of Relevant Educational History before Age 18*

Plaintiff was born on August 30, 1994. [R. 332.] On December 10, 2004, Linda Rich-Mason, Ph.D.,("Dr. Rich-Mason") Plaintiff's school psychologist, conducted a psychological evaluation of Plaintiff during his 4th grade year in school, administering the WISC-III Edition and the WIAT-2nd Edition.  [*Id.*]  At the time, Plaintiff was being served in the Learning Disabled/Self Contained program at school and was also receiving speech services.  [*Id.*] Dr. Rich-Mason noted that prior testing in February 2002 by school psychologist Neal Gadry [*see* R. 339–42], when Plaintiff was in first grade, resulted in a Full Scale score of 75 on the WISC-III while noting significant discrepancies on the testing [*see* R. 341].  [*Id.*] Dr. Rich-Mason's testing, however, resulted in a Full Scale IQ score of 68 on the WISC-III test, with the testing scores showing within the low end of the Borderline range.  [R. 334.]

Plaintiff's strengths were in his ability to learn visual-motor skills from repetitive experience; ability to perceive, analyze, synthesize and reproduce abstract designs; and visual comprehension and organization. [*Id.*] Plaintiff's weaknesses were in his long term memory for facts and figures; abstract and concrete reasoning abilities; arithmetic reasoning; vocabulary usage; common sense reasoning abilities; visualizing essential from non-essential detail; seeing a total situation through the use of sequential planning related to a series of events; visual-motor coordination; simple assembly skills; and the ability to synthesize concrete parts into a meaningful whole. [*Id.*] Plaintiff was found to be reading on a 1.2 grade level; doing math on a 2.2 grade level; and understanding written language on a 2.2 grade level. [R. 335.] Dr. Rich-Mason concluded that Plaintiff was functioning within the Educable Mentally Disabled range and learned best when material was presented through the visual channel. [R. 336.] Dr. Rich-Mason also indicated that school counseling may be warranted for Plaintiff's immaturity. [*Id.*]

A psychoeducational report by Stephen Spearman ("Spearman"), a licensed psychoeducational specialist, dated December 5, 2007, showed Plaintiff had academic difficulties in the areas of reading, written language and math. [R. 329.] Testing on the WIAT-2nd Edition, showed Plaintiff functioned at a 2.5 grade level in word reading; 1.8 grade level in reading comprehension; 4.7 grade level in numerical operations; and 3.2 grade level in math reasoning. [R. 330.] Plaintiff's test results were noted to be well below expected levels for his age (13 years 4 months) and grade placement (6th grade). [*Id.*] Spearman noted that Plaintiff's scores suggested a strong need for services in all academic areas evaluated, but that the final decision should be made by the school's multidisciplinary team. [R. 331.]

On September 1, 2010, when Plaintiff was approximately 16 years old, Spearman administered the WISC-IV Core/Supplemental and WIAT-III tests to Plaintiff. [R. 214.] The results of the WISC-IV indicated Plaintiff's verbal comprehension ("VCI") as extremely low; his perceptual reasoning ("PRI") was average; and his working memory ("WMI"), processing speed ("PSI") and full scale score of 68–78 were borderline. [*Id.*] The background information noted on the results indicated that Plaintiff had been placed in a self-contained program as a learning disabilities student and also had speech/language therapy during his early grades; and that he would be moved to a resource room setting as he moved to high school. [*Id.*] The testing showed Plaintiff reading on a 1.6 grade level; solving math problems on a 4.2 grade level; word reading on a 2.2 grade level; essay composition on a 3.4 grade level; pseudoword decoding on less than a 1.0 grade level; and conducting numerical operations on a 3.7 grade level. [R. 217.]

On the WIAT-III, Spearman noted that Plaintiff continued to have scores in all areas of achievement that are significantly below his ability as measured by the WISC-IV scale which reached the average range. [R. 219.] Spearman noted that Plaintiff's composite scores make him eligible for learning disabilities services if all other requirements are met. [*Id.*] Plaintiff's Verbal Comprehension scale result was significantly below the Average range and was consistent with academic performance. [*Id.*]

According to Plaintiff's educational records from McCormick County School District, McCormick, South Carolina, Plaintiff was identified as having a learning disability and spent from 40%–79% of his time in a regular education environment. [R. 200.] His IEP for the school year 2012–2013 indicated Plaintiff was in the 11th grade; liked shopping, listening to music, watching TV and competitive sports; wanted to attend a two-year college and

major in computer graphics; but that he needed transition services focused on instruction and acquisition of daily living skills. [*Id.*]

In a letter from the Special Education Department of the McCormick County School District, Plaintiff's mother was advised that Plaintiff's most recent evaluation, dated September 1, 2010, showed some improvement but not enough to place him in regular education classes. [R. 327.]

Plaintiff's IEP dated March 16, 2012, indicated that Plaintiff could not read fluently and had to take time to decode words as well as to comprehend what he had read. [R. 202.] Plaintiff was described as having a good work ethic; as polite with an excellent demeanor; and as able to complete almost all of his work. [*Id.*] The IEP also noted that math was Plaintiff's strength. [*Id.*] Plaintiff's accommodations under the IEP included allowing Plaintiff to use a calculator on math tests and assignments; allowing extended time in the special education ("SPED") classroom to finish tests or assignments if needed; and allowing Plaintiff to ask his teacher to read certain words or an entire test to him due to his difficulty in decoding and comprehension. [R. 203.] Further, Plaintiff would be allowed to retake any test or quiz in the general education classroom if he scored below 70, with the new grade recorded as the final grade. [*Id.*] Supplemental services provided to Plaintiff included teacher training and daily epileptic medication administered by the nurse. [*Id.*] Plaintiff also received 500 minutes per week of direct education services. [R. 205.] Plaintiff's end-of-course exams were administered orally. [R. 207.] Plaintiff's IEP also indicated that he would not be able to participate in regular classes for English and Math. [R. 210.]

A functional report (child age 12 to 18th birthday) completed by Plaintiff's mother,

Shelethia Gilchrist ("Mrs. Gilchrist" or "Mother") indicated that he has significant problems with his short term memory but tries hard.[13] [R. 231.]  Mrs. Gilchrist described Plaintiff as wanting to know things but that he struggles to retain the information which frustrates him. [*Id.*]  She explained that Plaintiff can read but does not always understand what he reads; can tell time on a digital clock; cannot add/subtract/multiply big numbers; can make change with small bills; and struggles to carry out simple instructions at times due to his memory problems.  [R. 232.]  Plaintiff's mother described him as shy and very polite, and said that he makes friends with younger kids because he is still on a 5th–6th grade level himself. [R. 233.]  Mrs. Gilchrist asked the school band director if Plaintiff could be the "band manager" so that he could work on his social skills.  [*Id.*]  She described Plaintiff as shy and feeling as if others do not like him because they think something is wrong with him due to his learning disability.  [*Id.*]  His mother explained that Plaintiff was doing okay managing the band and has made a couple friends who are around 10 years old although he is 18 years old.  [*Id.*]  Mrs. Gilchrist indicated that Plaintiff could get to school on time; study and do homework with help; take medication; ride the school bus; accept criticism or correction; stay out of trouble; obey rules; avoid accidents; and ask for help sometimes (depending on the who or what) due to his shyness.  [R. 234.]  Mrs. Gilchrist claimed Plaintiff is disabled due to his learning disability, epilepsy and being borderline diabetic.  [R. 238.]

### *Brief Summary of Relevant Educational History after Age 18*

Plaintiff turned 18 years old on August 30, 2012. [R. 15.] On November 12, 2012, Plaintiff's math and English academic support teacher for the previous two years, Shannon

---

[13] This report does not contain the date it was completed.  However, at one place on the report, Mother indicated that Plaintiff was 18 at the time she completed it. [R. 228–36.]

King Patterson ("Patterson"), completed a Teacher Questionnaire regarding Plaintiff's overall functioning.  [R. 244.]  Patterson, who saw Plaintiff twice a day, five days per week, noted that Plaintiff's current instructional level for reading was 5th grade; math was 4th grade; and written language was 4th grade.  [*Id.*]

With respect to Plaintiff's *ability to acquire and use information*, Patterson noted that Plaintiff had an obvious problem comprehending oral instruction; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; providing organized and oral explanations and adequate descriptions; and applying problem solving skills in class discussions.  [R. 245.]  She also noted that Plaintiff had a serious problem expressing ideas in written form; learning new material; and recalling and applying previously learned material.  [*Id.*]  Patterson described Plaintiff as "not very independent at all," and much more comfortable around contained students.  [*Id.*]

With respect to Plaintiff's *ability to attend and complete tasks*, Patterson indicated that, on a weekly basis, Plaintiff had a slight problem waiting to take turns and changing from one activity to another without being disruptive. [R. 246.]  She also noted that Plaintiff had an obvious problem paying attention when spoken to directly; sustaining attention during play/sports activities; focusing long enough to finish assigned activity or task; refocusing to task when necessary; carrying out single-step instructions; and working without distracting self or others.  [*Id.*]  Lastly, Patterson noted that Plaintiff had a serious problem carrying out multi-step instructions; completing homework assignments and completing work accurately without careless mistakes; as well as a very serious problem organizing his own things or school materials and working at a reasonable pace and

finishing on time.  [*Id.*]  Patterson indicated that Plaintiff receives two periods of scheduled resource help daily, and also receives help throughout the day as needed.  [*Id.*]

Regarding Plaintiff's *ability to interact and relate to others*, Patterson noted that, on a weekly basis, Plaintiff had no problem playing cooperatively with other children, making friends, seeking attention appropriately or expressing anger appropriately.  [R. 247.] Patterson noted, however, that, on a weekly basis, Plaintiff had a slight problem relating experiences and telling stories, as well as using language appropriate to the situation and listener.  [*Id.*]   On a daily basis, however, Patterson noted that Plaintiff had an obvious problem following classroom/game/sports rules; respecting/obeying adults in authority; introducing and maintaining relevant and appropriate topics of conversation; taking turns in conversation; interpreting meaning of facial expression, body language, hints or sarcasm; and using adequate vocabulary and grammar to express thoughts/ideas in general and everyday conversation.  [*Id.*]

With respect to *interacting and relating with others*, Patterson noted that an individual, as a familiar listener, could understand no more than half of Plaintiff's speech on the first attempt on known and unknown topics of conversation, as well as after repetition and/or rephrasing.  [R. 248.]

With regard to *moving about and manipulating objects*, Patterson noted that Plaintiff had no problem moving and manipulating things by pushing, pulling, lifting, carrying, transferring objects, or coordinating eyes and hands to manipulate small objects. [*Id.*] Patterson noted slight problems, however, when it came to Plaintiff moving his body from one place to another requiring standing, balancing, shifting weight, bending, kneeling, crouching, walking, running, jumping or climbing.  [*Id.*]  Patterson also noted a slight

problem with Plaintiff demonstrating strength, coordination, dexterity in activities or tasks; managing pace of physical activities or tasks; showing a sense of his body's location and movement in space; integrating sensory input with motor output; or planning, remembering or executing controlled motor movements. [*Id.*] Patterson questioned whether Plaintiff needed occupational therapy. [*Id.*]

With regard to *caring for himself*, Patterson noted no problem with Plaintiff caring for physical needs such a dressing or eating and taking care of personal hygiene. [R. 249.] Patterson did note, however, a slight problem on a weekly basis with Plaintiff's ability to handle frustration appropriately; be patient when necessary; cooperate in or be responsible for taking needed medications; use good judgment regarding personal safety and dangerous circumstances; identify and appropriately assert emotional needs; respond appropriately to changes in his own mood (calming himself); or using appropriate coping skills to meet daily demands of the school environment. [*Id.*] Patterson noted that Plaintiff missed school on a bi-weekly basis due to illness. [R. 250.]

A few days later, on November 28, 2012, Patterson completed another Teacher Questionnaire regarding Plaintiff's overall functioning, noting that she had known Plaintiff for two years, saw him two-hours per day, and that she was instructing Plaintiff in reading on a 3.5 grade level twice daily; math on a 4.0 grade level; and written language on a 3.0 grade level twice daily. [R. 271.]

With respect to *acquiring and using information*, Patterson noted obvious problems with Plaintiff's ability to comprehend oral instruction and to understand school and content vocabulary. [R. 272.] Patterson noted serious problems, however, in Plaintiff's ability to read and comprehend written material; comprehend and do math problems; understand

and participate in class discussions; provide organized oral explanations and adequate descriptions; learn new material; recall and apply previously learned material; and apply problem-solving skills in class discussions.  [*Id.*]  Patterson also found that Plaintiff had a very serious problem expressing ideas in written form.  [*Id.*]

With respect to <u>*attending and completing tasks*</u>, Patterson found that Plaintiff had no problem waiting to take turns or changing from one activity to another without being disruptive.  [R. 273.]   Patterson did note, however, that on a daily basis Plaintiff had a slight problem paying attention when spoken to directly; sustaining attention during play/sports activities; carrying out single-step instructions; and working without distracting self or others.  [*Id.*] Patterson found Plaintiff to have, on  a daily basis, an obvious problem carrying out multi-step instructions, as well as a serious problem focusing long enough to finish an assigned activity or task; refocusing to task when necessary; organizing his own things or school materials; completing class/homework assignments; completing work accurately without careless mistakes; and working at a reasonable pace/finishing on time.  [*Id.*]

With regard to <u>*interacting and relating with others*</u>, Patterson noted no problem with Plaintiff making and keeping friends; and slight problems playing cooperatively with other children; seeking attention appropriately; expressing anger appropriately; introducing and maintaining relevant and appropriate topics of conversation; and taking turns in a conversation.  [R. 274.] Patterson also noted obvious problems with Plaintiff's ability to respect/obey adults in authority; relate experiences and tell stories; use language appropriate to the situation and listen; interpret meaning of facial expression, body language, hints, or sarcasm; or use adequate vocabulary and grammar to express

36

thought/ideas in general and everyday conversation.  [*Id.*]  Lastly, Patterson indicated that Plaintiff had a serious problem asking permission appropriately and following rules in the classroom, games or sports.  [*Id.*]  Patterson did not indicate the frequency in which these problems arise.  Patterson did indicate, however, that Plaintiff can do very little independently and requires one-on-one instruction to complete most activities in the classroom and at home.  [*Id.*]

Also, with respect to *interacting and relating with others*, Patterson indicated that, as a familiar listener, she could understand Plaintiff's speech almost all of the time on her first attempt or after repetition or rephrasing. [R. 275.]  Patterson also indicated that Plaintiff's speech could be understood half to two-thirds of the time by a familiar listener if the topic of conversation is unknown.  [*Id.*]

Regarding *moving and manipulating objects*, Patterson indicated that there were no observed problems.  [*Id.*]

And, with respect to *caring for himself*, Patterson noted that, on a daily basis, Plaintiff had no problem with taking care of personal hygiene; caring for physical needs such as dressing and eating; cooperating in or being responsible for taking needed medication; using good judgement regarding personal safety and dangerous circumstances; using appropriate coping skills to meet daily demands of school environment; and knowing when to ask for help.  [R. 276.] Patterson, however, noted a slight problem, on a daily basis, with identifying and appropriately asserting emotional needs and responding appropriately to changes in his own mood (calming self); and obvious problems with handling frustration appropriately and being patient when necessary. [*Id.*]  Patterson also indicated that Plaintiff does not frequently miss school due

to illness. [R. 277.]

On February 29, 2013, Plaintiff was determined by South Carolina Rehabilitation Department ("Voc. Rehab") to meet the criteria established for a person with a significant disability due to having a severe mental impairment that seriously limits his capacities in the terms of employment with respect to self-direction, work tolerance and work skill. [R. 347.] Voc. Rehab noted that Plaintiff had one or more physical or mental disabilities resulting from a specific learning disability and epilepsy. [*Id.*] Plaintiff's primary disability was noted to be a cognitive impairment involving learning, thinking, processing information and concentration. [R. 349.] His secondary disability was noted to be related to manipulation/dexterity, orthopedic/neurological impairments; and epilepsy. [R. 349.]

Notes from a March 12, 2014, IEP meeting indicated that Plaintiff's mother had been expressing her concern that her son is being "pushed through" the system and that the staff was giving him false hope of his ability to attend college when, in reality, Plaintiff did not comprehend well and must have everything read to him. [R. 310.] Mrs. Gilchrist expressed "confusion" regarding the fact that her son was on the A-B honor roll at school but could not pass the exit exams for school. [*Id.*] Plaintiff's mom feared that, once he graduates and does not have the structure of the special education staff, he will be on his own and lost, having learned absolutely nothing. [R. 311.]

On September 15, 2014, Patterson completed another Teacher Questionnaire related to Plaintiff noting that she sees Plaintiff for two periods per day on a daily basis and that he was working on a 5th-6th grade level. [R. 361.]

With respect to Plaintiff's ability to *acquire and use information*, Patterson noted that Plaintiff had an obvious problem understanding and participating in class discussions. [R.

362.]  Patterson also noted that Plaintiff had a serious problem comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; providing organized oral explanations and adequate descriptions; expressing ideas in written form; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions.  [*Id.*]  Patterson explained that Plaintiff had to have one-on-one attention to complete assignments, did not like to talk in class, and sat right by the teacher in most classes.  [*Id.*]

With respect to *attending and completing tasks*, Patterson indicated that Plaintiff had no problem waiting to take turns, changing from one activity to another without being disruptive and organizing his own things or school materials. [R. 363.]  Patterson also noted that Plaintiff had a slight problem with paying attention when spoken to; sustaining attention during play/sports activities; focusing long enough to finish assigned activity or task; carrying out single-step instructions; completing class/homework assignments.  [*Id.*]  Patterson noted obvious problems with Plaintiff's ability to refocus on task when necessary; carry out multiple-step instructions; completing work accurately without careless mistakes; and working without distracting self or others.  Patterson indicated that Plaintiff had a very serious problem working at a reasonable pace and finishing on time.  [*Id.*]  Patterson noted that Plaintiff was not very independent and that he depended on her for help in all of his subjects.  [*Id.*]

With respect to *interacting with others*, Patterson noted that Plaintiff had no problem making and keeping friends; seeking attention appropriately; expressing anger appropriately; asking permission appropriately; following classroom/game/sports rules;

respecting/obeying adults in authority; relating experiences and telling stories; using language appropriate to the situation and listening; introducing and maintaining relevant and appropriate topics of conversation and taking turns in a conversation. [R. 364.] Patterson noted only a slight problem with Plaintiff playing cooperatively with other children; interpreting the meaning of facial expression, body language, hints and sarcasm; and using adequate vocabulary and grammar to express thoughts/ideas in general and everyday conversation. [*Id.*] Patterson noted that Plaintiff did not have many friends and chose to "hang-out" with adults. [*Id.*]

With regard to *interacting and relating to others*, Patterson noted that, as a familiar listener, Plaintiff's speech could be understood on a first attempt when the topic of conversation is known or unknown, and after repetition and/or rephrasing. [R. 365.] Patterson also noted no problems with Plaintiff's ability to *move about and manipulate objects* or in *caring for himself*. [R. 365–66.]

Notes from Voc. Rehab dated April 20, 2010–October 4, 2012, documented Plaintiff's work with a job coach to learn how to complete job applications, interview and obtain some trial work experience. [*See* R. 430–47.]

### Brief Summary of Relevant Medical History

Treatment notes from McCormick Family Practice and The Children's Center dated June 8, 2012, through July 12, 2012, generally showed that Plaintiff's epilepsy was stable on his current medication and that Plaintiff was at an increased risk for diabetes. [*See* R. 378–95.] Treatment notes for Plaintiff, who was also seen at Piedmont Health Group, LLC., Neurology, between August 9, 2011, and November 12, 2012, indicated that Plaintiff has had no seizures and that his migraine headaches were being treated with Nadolol and

Fioricet.  [*See* R. 400–05.]

On December 18, 2012, Plaintiff underwent a confidential psychological evaluation at Georgia Psychology and Counseling, by licensed psychologist Adrian Janit, Ph.D. ("Dr. Janit").  [*See* 410–17.]   After summarizing Plaintiff's medical and educational history, Dr. Janit summarized the results of his testing, finding that Plaintiff at age 18 functionally fell in the borderline range with a WAIS-IV Full Scale Score IQ of 70.  [R. 415.]  Dr. Janit indicated that Plaintiff's scores on the WRAT-4 indicated that his current reading ability fell at the 3.1 grade level; spelling ability fell at the 4.4 grade level, and his mathematics ability fell at the 4.6 grade level.  Plaintiff's scores on the BVMGT-II placed him in the average to low average range of visual-motor integration skills and short-term memory.  [*Id.*] Dr. Janit diagnosed Plaintiff with borderline intellectual functioning and cognitive disorder, not otherwise specified.  [R. 415–16.]   With respect to Plaintiff's mental abilities, Dr. Janit opined as follows:

1.  Plaintiff's ability to understand and carry out instructions is *moderately limited* in that he seemed able to comply with all requests made of him during the evaluation, but had difficulty comprehending.

2.  Plaintiff's ability to maintain attention and concentration is *mildly limited* in that he had trouble attending and focusing, and his working memory fell in the borderline range.

3.  Plaintiff's ability to respond appropriately to coworkers, supervisors, and the general public is *moderately limited* as he reportedly is shy and had difficulty expressing himself.

4.  Plaintiff's ability to adhere to a work schedule and complete tasks in a timely fashion is *moderately limited* as evidence by his low processing speed.

5.  Plaintiff's ability to withstand the stresses and pressures associated with most work settings is *moderately limited* in that everyday stressors have the potential to trigger frustration and/or distress.

[R. 416.]  Based on these findings, Dr. Janit found that Plaintiff was probably incapable of managing his own finances and that, if he is eligible for benefits, he would probably require a payee.  [*Id.*]

Between November 12, 2012, and March 11, 2014, Plaintiff was also seen at Tower Pointe Neurology regarding his headaches.  [*See* R. 426–29.]  Treatment notes indicated that both his epilepsy and migraine headaches were well controlled. [*See, e.g.*, 428.]

**Attending and Completing Tasks Domain and SSR 11-2p**

Plaintiff argues the ALJ erred under childhood disability standards by failing to find that Plaintiff had marked limitations in the functional domains of attending and completing tasks and in interacting and relating with others.[14]  [Doc. 16 at 6.] He contends the ALJ improperly failed to find that Plaintiff's limitations in attending and completing tasks, and in interacting and relating with others, seriously interfered with his ability to independently initiate, sustain or complete activities.  [*Id.* at 7.] And, as a result of this error, under adult disability standards Plaintiff contends the ALJ failed to provide the VE with an appropriate hypothetical containing his work related limitations as directed by SSR 11-2p.  [*Id.* at 15.] The Court agrees that substantial evidence does not support the ALJ's determination that Plaintiff had less than marked limitation in attending and completing tasks or the ALJ's hypothetical to the VE.

### *Attending and Completing Tasks Domain*

As explained above, the Commissioner will generally find that a child has a "marked" limitation in a domain when the child's impairment or combination of impairments interferes

---

[14] Plaintiff contends the ALJ properly found Plaintiff had <u>marked</u> limitations in acquiring and using information. [*Id.*]

seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "'marked' limitation occurs when an individual's impairment 'seriously interferes' in the particular domain, or when the individual scores roughly two standard deviations below the mean on tests." *Siler v. Astrue*, 2009 WL 1759558, at *8 (W.D.Va. June 19, 2009); 20 C.F.R. § 416.926a(e)(2)(I). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme,'" and may arise when several activities are limited, or when only one is limited. 20 C.F.R. § 416.926a(e)(2)(i).

For this domain, the Commissioner considers how well the child is able to focus and maintain his attention and how well he can begin, carry through, and finish activities, as well as the pace at which he can perform activities and the ease with which he can change them. 20 C.F.R. § 416.926a(h). As with the other domains, limitations in this domain are determined based on various age group descriptors. *Id*. § 416.926a(h)(2). For instance, a child of school age should be able to focus his attention to follow directions, remember and organize his school materials, and complete classroom and homework assignments. *Id.* He should be able to concentrate on details; not make careless mistakes in his work beyond what would be expected in other children who do not have impairments; change his activities or routines without distracting himself or others; and stay on task and in place when appropriate. *Id*. Moreover, the school-age child should be able to sustain his attention well enough to participate in group sports, read by himself, and complete family chores, as well be able to complete a transition task—such as to be ready for the school bus, change clothes after gym, or change classrooms—without extra reminders and accommodation. *Id.*

### SSR 11-2p

Social Security Ruling 11-2p provides guidance on how the agency evaluates disability in young adults (ages 18–"approximately 25"). SSR 11-2p, 2011 WL 4055665 (Sept. 12, 2011). SSR 11-2p directs that, in evaluating such claims, the ALJ apply the same definition of disability used for other adults. *Id*. at *2. Appropriate sources of evidence about a young adult's ability to work include medical sources; non-medical sources such as family members and educational personnel; and school programs. *Id*. at **4–6. Other relevant considerations in evaluating a young adult's impairment-related limitations include evidence regarding functioning from educational programs; community experiences, including job placements; psychosocial supports and highly structured or supportive settings; extra help and accommodations; and work-related stress. *Id.* at **6–10. Evidence that a claimant has difficulties in the above areas does "not necessarily establish that a young adult is disabled, only that the person may have limitations that affect what work he or she may be able to do." *Id.* at *7.

### ALJ's Determination

The ALJ concluded that, prior to age 18, Plaintiff had *less than marked limitation* in attending and completing tasks. [R. 19.] The ALJ explained the basis for his finding as follows:

> In Teacher Questionnaires, Shannon Patterson, the claimant's teacher, indicated that the claimant has an obvious problem to a serious problem in carrying out multi-step instructions; a serious problem completing class/homework assignments; a serious problem completing work accurately without careless mistakes; and a serious problem to a very serious problem working at reasonable pace/finishing on time. She also noted that the claimant has a slight problem to an obvious problem carrying out single-step instructions and he has an obvious

> problem to a <u>serious problem</u> focusing long enough to finish an
> assigned activity or task (Exhibit 6E/3 and 9E/7).
>
> However, records from the McCormick County School District
> indicate that the claimant has a good work ethic and he
> completes almost all of his work. He is polite and has an
> excellent demeanor (Exhibit 16E/10). As noted above, the
> record also indicates that the claimant had the ability to
> complete his homework/classroom assignments, as he
> graduated from high school.

[R. 20.]

### *Discussion*

Upon review of the record evidence, the Court finds it curious that the ALJ noted findings by Plaintiff's special education teacher that he had a <u>serious problem</u> completing class/homework assignments; a <u>serious problem</u> completing work accurately without careless mistakes; a <u>serious problem</u> to a <u>very serious problem</u> working at reasonable pace/finishing on time, and an <u>obvious problem</u> to a <u>serious problem</u> focusing long enough to finish an assigned activity or task, but dismissed these findings based on other school district records that Plaintiff had a good work ethic, completed almost all of his work, was polite, and had graduated from high school. The Court is constrained to find that this explanation does not constitute substantial evidence to dismiss the findings of Plaintiff's special education teacher.

While the ALJ chose to focus on evidence showing that Plaintiff was polite, completed his homework assignments, and graduated, the ALJ failed to explain how these factors combined to dismiss evidence that Plaintiff had a serious problem completing homework assignments and completing work accurately without careless mistakes [R. 246]; a serious problem focusing long enough to finish an assigned activity or task,

refocusing, and working at a reasonable pace to finish on time [R.273, 363]; and that Plaintiff could do very little independently and required one-on-one instruction to complete most activities in the classroom and at home [R. 274, 362]. Plaintiff testified that he was working with a vocational counselor to learn to be "more faster." [R. 55.] Plaintiff's mother testified that he graduated with a certificate in June 2014 [R. 63], but did not pass the high school exit exam [R. 74], and never completed any of his school work on his own [R. 64]. Plaintiff would receive help from his teacher with his homework, or the teacher would send him to an after school program for help. [R. 65.] Plaintiff's mother testified that he had trouble remembering if you tell him to do more than one thing [R. 69], and that his vocational coach had indicated he would not be a candidate for a production type job because it takes him a long time to do a task [R. 70].

As stated above, the focus of the domain for attending and completing tasks should consider how well Plaintiff is able to focus and maintain his attention and how well he can begin, carry through, and finish activities, as well as the pace at which he can perform activities and the ease with which he can change them. It does not appear the ALJ considered any of the above evidence in concluding that Plaintiff had less than marked limitations solely because he was polite, had an excellent demeanor, graduated and completed most of his school work. Because the Commissioner will generally find that a child has a "marked" limitation in a domain when the child's impairment or combination of impairments interferes seriously with his ability to independently initiate, sustain, or complete activities (20 C.F.R. § 416.926a(e)(2)(i)), it is not clear how the ALJ determined that Plaintiff's ability to *attend to and complete tasks* was less than a marked limitation in light of evidence suggesting Plaintiff's inability to independently initiate, sustain or complete

46

activities. Accordingly, the Court cannot find that the ALJ's decision is supported by substantial evidence.

Additionally, when addressing this matter to the VE, the ALJ proposed an individual who is "limited to simple, routine, and repetitive tasks performed in an work environment free of fast-paced production requirements; involving only simple work-related decisions and with few, if any, workplace changes." [R. 78.] However, it is not clear to the Court that substantial evidence supports a finding that Plaintiff was capable of simple, routine and repetitive tasks even in a work place environment free of fast-paced requirements. Furthermore, the VE testified that there were no jobs available for the above hypothetical person where he had a severe mental impairment that impairs his ability to sustain sufficient concentration, persistence or pace to do even simple, routine or repetitive tasks on a regular basis. [*Id.*] The evidence suggested that Plaintiff was not able to perform simple, repetitive work tasks through Voc. Rehab at the time of the hearing without a vocational coach being present. [R. 43.] Thus, it is unclear to the Court that the ALJ's hypothetical to the VE is supported by substantial evidence, and the ALJ provided no discussion for the Court to consider on this issue.

**Adult Disability Determination After Age 18 and Ability to Stay on Task**

Plaintiff contends the ALJ failed to provide an appropriate hypothetical to the VE with respect to all of Plaintiff's work related limitations, particularly Plaintiff's inability to do the tasks of a job independently, appropriately, effectively and on a sustained basis. [R. 16 at 15–16.] Plaintiff contends that, despite extensive training through Voc. Rehab., Plaintiff continued to show limitations in pace, attention and productivity, and his vocational coach did not place him in any unsupervised work settings. Thus, the ALJ should have

provided a hypothetical to the VE with regard to Plaintiff's need for greater supervision, assistance and accommodations.  [*Id.* at 16.]  The Court agrees.

As stated previously, when addressing this matter to the VE, the ALJ's hypothetical proposed an individual who is "limited to simple, routine, and repetitive tasks performed in an work environment free of fast-paced production requirements; involving only simple work-related decisions and with few, if any, workplace changes." [R. 78.]  The hypothetical never mentioned Plaintiff's greater need for supervision or assistance as it was provided to him by his vocational coach.

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine his ability to perform work-related physical and mental activities on a regular and continuing basis.  SSR 96-8p.  Thus, under the regulations, the ALJ is required to consider Plaintiff's ability to stay on task which, based on the record evidence, appears to be impaired.  *See Bailey v. Colvin*, No. 5:14-248-DCN-KDW, 2015 WL 2449044, at *13 (D.S.C. May 21, 2015) (report and recommendation adopted after no objections filed, finding "[h]ere, although the ALJ's RFC finding was appropriate based on the consultants' opinion as to his ability to perform simple tasks, the ALJ's RFC does not account for Plaintiff's limitations in concentration, persistence, or pace as to his ability to stay on task.  Accordingly, the undersigned is unable to determine if substantial evidence supports the ALJ's RFC assessment.") (citing *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015).  Accordingly, the Court finds that substantial evidence does not support the ALJ's hypothetical to the VE.

**Remaining Allegations of Error**

Because the Court finds sufficient basis to remand this matter to the ALJ for the

reasons explained above, the Court declines to address Plaintiff's remaining allegations of error. The ALJ, however, is directed to take into consideration Plaintiff's remaining allegations of error on remand. The ALJ is also directed to conduct a more thorough analysis of Plaintiff's impairments under Listing 12.05C[15].

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be  REVERSED pursuant to sentence four of 42 U.S.C. § 405(g), and the case is REMANDED to the Commissioner for further administrative action consistent with this Report and Recommendation.

**IT IS SO RECOMMENDED**.


June 6, 2017                                              s/Jacquelyn D. Austin
Greenville, South Carolina                        United States Magistrate Judge

---

[15] On remand the ALJ should sufficiently discuss whether Listing 12.05C was satisfied. The ALJ notably mentioned Listing 12.05C but did not sufficiently explain his consideration of it. [*See* R. 24.] Under Listing 12.05C, a claimant must prove that his impairment meets all three prongs for a finding of disability under Listing 12.05C, which means he must show (1) deficits in adaptive functioning during the developmental period, (2) a valid IQ score of 60 through 70, and (3) another physical or mental impairment that causes an additional and significant work-related limitation of function. *Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir.2012). An impairment which imposes an additional and significant work-related limitation of function is any impairment which is defined as severe. 20 C.F.R., Pt. 404, Subp. P, Appx. 1, § 12.00(A). The ALJ found that Plaintiff had severe impairments of epilepsy and borderline intellectual functioning. [R. 16.] However, the ALJ also concluded that Plaintiff did not have another impairment that imposed an additional and significant work-related limitation of function. [R. 24.] As such, the ALJ must properly explain and clarify his decision. As it stands, the ALJ's Listing analysis is not supported by substantial evidence. Thus, reversal is warranted, and a remand is appropriate to receive clarity regarding these findings. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986).